**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| XPORT FORWARDING LLC, | Case No.: SACV 23-01566-CJC (DFMx) |
| Plaintiff, | |
| v. | ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF [Dkt. 14] |
| MESITIS DWC LLC and DOES 1–100, | |
| Defendants. | |

## I.    INTRODUCTION

Xport Forwarding LLC filed this action in Orange County Superior Court against Mesitis DWC LLC and unnamed Does, asserting claims for conversion and intentional interference with prospective economic relations and seeking a judicial determination as to the validity of Mesitis's lien against Xport's goods on the basis that Mesitis is wrongfully withholding and threatening to auction Xport's goods stored with Mesitis.

(*See* Dkt. 2 Ex. A [Compl.].)  Mesitis removed the case to this Court, (Dkt 2 [Notice of Removal), and filed a counterclaim against Xport, asserting claims for breach of written contract, open book account, and account stated on the basis that Xport refuses to pay Mesitis for storing its property, (*see* Dkt. 19 [Counterclaim]).  Now before the Court is Xport's motion for a preliminary injunction "directing Mesitis to (a) release all but 45 pallets of Xport's goods [and] (b) refrain from selling the remaining goods at public auction until the completion of this action."  (Dkt. 14 [Mot.].)  For the following reasons, the motion is **DENIED**.

## II.    BACKGROUND

This case is about a dispute over the cost of storage of Xport's goods and Mesitis's attempt to foreclose on its warehouseman's lien.  Between 2021 and 2022, Xport delivered some quantity of gloves and masks to Mesitis for storage.  (*Compare* Mot. at 2 *with* Dkt. 17-3 [Declaration of Patrick Pesek, hereinafter "Pesek Decl."] ¶ 2.)  For the purposes of this motion the parties agree, and the evidence supports, that Mesitis is currently holding 985 pallets of gloves (approximately 111.5 cartons of gloves per pallet) and 23 pallets of masks[1] (560 cartons of masks per pallet).  (*See* Dkt. 21 [Reply] at 2.) The parties hotly contest the value of these goods—Xport asserts they are properly valued at $9,381,302.50, (*id.*), while Mesitis claims the gloves are only worth between $167,754 to $279,590, (Dkt. 17-2 [Declaration of Marilyn Gursha, hereinafter "Gursha Decl."] at 2).

Around July 2023, there was a dispute over the storage bill.  While the parties worked to address the dispute, Xport offered to make a partial payment in exchange for

---

[1] Because the majority of the goods at issue are gloves, on which the parties focus their arguments, the Court so too focuses on the gloves in its analysis.  Xport's claimed value for the masks is $56,000 to $98,000, (Reply at 2), which does not materially impact the Court's findings considering the uncertainty of auction sales.

the release for some of its goods.  Mesitis declined and did not release any of Xport's stored goods.  (*See* Compl. ¶¶ 11–16; Mot. at 3; Dkt. 17 [Opp.] at 3.)  Xport seems to concede that, at some point, Mesitis had a valid warehouseman's lien against Xport's goods pursuant to California Commercial Code Section 7209.  (*See* Compl. ¶ 28 ["Defendant has lost the lien *it once had* on the Property pursuant to California Commercial Code section 7209"] [emphasis added].)  On July 24, 2023, Mesitis sent letters to Xport and Xport's purported customers with a copy of a storage invoice for $448,078.94, representing that Mesitis had a warehouseman's lien on Xport's goods and would sell Xport's goods in a public sale on August 28, 2023.  (Mot. at 3.)  Mesitis explains "[t]hose letters were sent to persons known to have an interest in the goods as Commercial Code § 7210(e) required."  (Opp. at 3; *see also* Dkt. 14-2 [Declaration of Mario Bruendel, hereinafter "Bruendel Decl."] Ex. 3 at 15 ["Mesitis has served you with this Notification because it understands that you claim an interest in the goods."].)  After Xport received the letter, the parties engaged in pre-litigation settlement discussions but were unable to resolve the matter.  (Mot. at 4.)

As a result, Xport brought the current action in California state court on August 11, 2023.  Shortly after Mesitis removed the case to federal court, Xport moved *ex parte* for a temporary restraining order to prevent Mesitis's sale from going forward and order the release of "all but 45 pallets of Xports goods."  (*See* Dkt. 7 [*Ex Parte* Application for a Temporary Restraining Order and Order to Release].)  The Court issued an order directing Xport to file a motion for a preliminary injunction and temporarily postponed Mesitis's sale.  (*See* Dkt. 13.)  Pursuant to the Court's order, Xport filed its motion for a preliminary injunction on September 1, 2023, and Mesitis filed its opposition on September 8, 2023.  Xport filed a reply in support of its motion on September 15, 2023.

The legal basis for Mesitis's motion and underlying complaint is a single case: *Fabrique Innovations, Inc v. Etiwanda Logistics, Inc*, 2020 WL 5441576 (C.D. Cal. July

30, 2020).  In that case, the court interpreted California Commercial Code Section 7209 to only provide for a warehouseman's lien limited in scope to the quantity of goods worth the charges owed.  *Id.* at 3.  On that basis, Xport argues that because Mesitis refuses to relinquish the majority of its goods, which it claims are worth far more than what it owes in storage fees, Mesitis has lost its lien pursuant to California Commercial Code Section 7209(e).  (*See* Mot. at 6, 8–9; Compl. ¶ 28 ["Plaintiff believes that Defendant lost its lien pursuant to section 7209(e) because Defendant unjustifiably refused to deliver the Property to Plaintiff because Defendant retained approximately $13.8 million worth of gloves (the entirety of the Property) as security for its lien when Defendant has only claimed that Plaintiff owes *less than* $500,000 in charges for storage and transportation."].)  Mesitis disagrees, arguing that *Fabrique* was wrongly decided and that Xport's claims are without merit.  (Opp. at 1, 5–7.)

## III.  LEGAL STANDARD

A preliminary injunction is an extraordinary and drastic remedy that may only be awarded upon a clear showing that the moving party is entitled to relief.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  The purpose of a preliminary injunction is to "preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered."  *Vera v. Pfiffer*, 2020 WL 5027991, at *1 (C.D. Cal. July 23, 2020).

To obtain a preliminary injunction, the plaintiff must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (explaining that the standard for issuing a temporary restraining order is "substantially identical" to that for issuing a preliminary injunction).  The Ninth Circuit

balances these factors using a "sliding scale" approach, where "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). However, the plaintiff must "make a showing on all four prongs." *Id.* at 1135.

A plaintiff's burden is "doubly demanding" if seeking a mandatory injunction. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Such relief is "subject to heightened scrutiny and should not be issued unless the facts and law *clearly favor the moving party.*" *Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (emphasis added).

## IV.   DISCUSSION

### A.   Likelihood of Success on the Merits

Xport has failed to show that it is likely to succeed on the merits of its case. For the reasons discussed below, the Court declines to follow *Fabrique*'s reasoning and analysis of the relevant statutory provisions.

Xport's likelihood of success on the merits turns on the meaning and application of California Commercial Code Sections 7209 and 7210. "As always, we begin with the text of the statute." *Limtiaco v. Camacho*, 549 U.S. 483, 488 (2007). In relevant part, Section 7209(a) states, "A warehouse has a lien against the bailor on the goods covered by a warehouse receipt or storage agreement or on the proceeds thereof in its possession for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law." Cal. Com. Code § 7209(a). But "[a] warehouse loses its lien on any

goods that it voluntarily delivers or unjustifiably refuses to deliver." *Id.* § 7209(e). Section 7210(a) provides:

> [A] warehouse's lien may be enforced by public or private sale of the goods, in bulk or in packages, at any time or place and on any terms that are commercially reasonable, after notifying all persons known to claim an interest in the goods. Notification may be made by mail, personal service, or verifiable electronic mail. The notification must include a statement of the amount due, the nature of the proposed sale, and the time and place of any public sale. The fact that a better price could have been obtained by a sale at a different time or in a method different from that selected by the warehouse is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. The warehouse sells in a commercially reasonable manner if the warehouse sells the goods in the usual manner in any recognized market therefor, sells at the price current in that market at the time of the sale, or otherwise sells in conformity with commercially reasonable practices among dealers in the type of goods sold. A sale of more goods than apparently necessary to be offered to ensure satisfaction of the obligation is not commercially reasonable, except in cases covered by the preceding sentence.

Section 7210(f) provides that "[a] warehouse may satisfy its lien from the proceeds of any sale pursuant to this section but shall hold the balance, if any, for delivery on demand to any person to which the warehouse would have been bound to deliver the goods." Finally, "[a] warehouse is liable for damages caused by failure to comply with the requirements for sale under this section and, in case of willful violation, is liable for conversion." *Id.* § 7210(i).

Upon a plain reading of a statute, Section 7209(a) does two things. First it establishes the scope of the lien—the "lien [is] against the bailor on the goods covered by a warehouse receipt or storage agreement or on the proceeds thereof in its possession." Second, it establishes the interest which the lien secures—the warehouse may recover "for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for

expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law."  Nothing in the statute's language suggests that the lien covers anything less than all "the goods covered by a warehouse receipt or storage agreement."

A brief review of the history and policy behind the warehouseman's lien law confirms this reading.  At common law, there was no authorization of a private right of sale—in enacting California's warehouseman's lien law, the legislature explicitly chose to grant the extra-judicial sale remedy to warehouses.  *See Melara v. Kennedy*, 541 F.2d 802, 805 (9th Cir. 1976) ("California Commercial Code [§] 7210 provides warehousemen with an extra-judicial sale remedy for the lien that they have on goods deposited with them.  Its historical predecessor was enacted in 1851.  This statutory authorization of a private right of sale was a departure from the common law, under which enforcement of a warehouseman's lien was by sheriff's sale.") (footnote and citation omitted); *Stewart v. Naud*, 125 Cal. 596, 598 (1899) ("At common law a warehouseman had a lien for storage charges, but such lien conferred no right to sell the property to which the lien attached, but only to hold it until his charges were paid.").  The reason for that choice is clear:  the legislature intended to give warehouses an "effective remedy against defaulting customers."  *See Nist v. Hall*, 24 Cal. App. 5th 40, 44 (2018) (quoting *Vitug v. Alameda Point Storage, Inc.*, 187 Cal. App. 4th 407, 415 (2010)); *see also Gray v. Whitmore*, 17 Cal. App. 3d 1, 24 (Ct. App. 1971) ("This expedient results in putting an end to further storage expenses; it affords reimbursement to the landlord for the storage and sale expenses; and it should, in most instances, provide for the payment of the balance of the proceeds to the tenant.").[2]  Without an effective and expedient remedy against defaulting customers, warehouses would only have recourse through a more cumbersome and potentially costly process.

---

[2] While *Nist* and *Gray* address different statutes, the reasoning applies with equal force here.

The statute's effective remedy includes "charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law." Cal. Com. Code § 7209(a). Depending on the goods and market, many of those charges will be unknown, as may be the commercially reasonable value of those goods sold at a public sale pursuant to Section 7210. Were warehouses required to return a defaulting customer's goods prior to a sale pursuant to Section 7210 based on unknown costs and values, the warehouse could well be deprived of the effective remedy intended by the legislature.

Xport would have the Court limit Mesitis's lien to "$448,000 worth of goods." (*See* Mot. at 2.) But Xport relies solely on *Fabrique*, which conflated what the lien is *against* with what the lien is *for*. The statute is simply not written in a way to limit a warehouse's lien to only those goods equal in value to what is owed. Indeed, one respected commentator has noted *Fabrique* "mistakenly applied this provision as a limitation on the scope of the warehouse's lien, rather than a limitation on the amount of goods that the warehouse could sell to satisfy its lien." 6 Hawkland Uniform Commercial Code Series § 7-210:4 n.7 (Mar. 2023); *see also Omega Env't Inc. v. Valley Bank NA*, 219 F.3d 984, 987 (9th Cir. 2000) (citing Hawkland Uniform Commercial Code Series for a different provision); *Pac. Sunwear of California, Inc. v. Olaes Enterprises, Inc.*, 167 Cal. App. 4th 466, 478, (2008) (same); *DBJJJ, Inc. v. Nat'l City Bank*, 123 Cal. App. 4th 530, 539 (2004) (same). Section 7210(a) confirms the Court's interpretation of the relevant provisions. It states that "[a] sale of more goods than apparently necessary to be offered to ensure satisfaction of the obligation is not commercially reasonable[.]" Xport's reading of the statute would render that provision superfluous, as the warehouse would not have the right to retain the goods at all, much less sell them. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be

construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]") (citation omitted).

With this understanding of the law regarding warehouseman's liens, the Court now addresses the merits of Xport's claims.

### 1.   Conversion

Under California law, the elements of a conversion claim are:  "(1) the plaintiff's ownership or right to possession of personal property; (2) the defendant's disposition of the property in a manner that is inconsistent with the plaintiff's property rights; and (3) resulting damages."  *Regent All. Ltd. v. Rabizadeh*, 231 Cal. App. 4th 1177, 1181 (2014). Xport's primary theory of conversion is that Mesitis is wrongfully withholding more of Xport's goods than necessary to cover what Xport owes.  (*See* Mot. at 6; Reply at 6.)  But as explained above, that is not so.  Mesitis is not holding Xport's goods in a manner that is inconsistent with Mesitis's rights.  Its lien covers all the goods that Xport agreed to pay Mesitis for storing.  Simply stated, Xport has failed to show that it is likely to prevail on its claim for conversion against Mesitis.

This conclusion remains unchanged even if the Court were to adopt *Fabrique*'s reasoning.  In that case, the court held "there must be a *reasonable relationship* between the goods withheld and the charges owed."  *Fabrique*, 2020 WL 5441576, at *3 (emphasis added).  The court found that the warehouse was withholding excessive goods because the plaintiff alleged a value of goods far in excess of what the plaintiff owed in storage fees, and the warehouse did "not offer any other basis for a lower valuation."  *Id.* Specifically, the warehouse sought a bond of $109,509.65, the court granted a bond of $186,255.65, and the plaintiff alleged it "had roughly $2.5 million of goods at the warehouse."  *Id.* at *3–5.  In other words, the charges represented just a "fraction" of the

alleged value of the goods.  *Id.* at *3.  In contrast, Mesitis provides a declaration from Marilyn Gursha, an individual experienced in the sale of goods such as those at issue who personally inspected the goods and concluded the gloves at issue "have a sale value ranging from $167,654 to $279,590."[3]  (Gursha Decl. ¶¶ 2–5.)  The same declaration provides a comparison to recently sold nitrile gloves with a per carton value that suggests a total value of between $700,000 to $800,000 ($7 per carton multiplied by 111.5 cartons per pallet multiplied by 985 pallets of gloves).  (*Id.* ¶ 4; *see also* Pesek Decl. [referencing internet auctions of gloves with asking prices ranging from $7 to $12.57 per case].)

Xport challenges this valuation primarily based on Mesitis's use of auction pricing. (*See* Mot. at 7; Reply at 4.)  But Section 7210 expressly allows for a public sale, and "[t]he fact that a better price could have been obtained by a sale . . . in a method different from that selected by the warehouse is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner."  Xport has not provided any evidence that a public auction would be commercially unreasonable.  To the contrary, unrebutted evidence shows that Xport itself, in a letter sent via email by the *same* firm that presently represents it in this case, has previously indicated an intent to use a public auction in foreclosing on a warehouseman's lien.  (Pesek Decl. Ex. 6.)

---

[3] Xport challenges Gursha's testimony as inadmissible witness opinion.  (*See* Mot. at 7; Reply at 5.)  In her declaration, Gursha explains she is the principal and owner of a company that "handles distressed and abandon[ed] cargo," which she founded in 1982.  (Gursha Decl. ¶ 1.)  She further explains that she has been involved in the sale of the type of goods at issue in this case on multiple occasions.  (*Id.* ¶ 4.) At this stage, the Court finds sufficient foundation to support her opinion testimony.  "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  The Court is permitted to consider evidence in deciding a motion for a preliminary injunction that does not strictly comply with the Federal Rules of Evidence as long as the evidence has indicia of reliability. "This flexibility exists because the urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult for a party to procure supporting evidence in a form that would be admissible at trial."  *Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), *aff'd,* 869 F.3d 848 (9th Cir. 2017) (cleaned up).  While district courts may consider evidence that does not strictly comply with all the Federal Rules of evidence, this does not mean that evidentiary issues have no relevance to this proceeding.  Such issues, however, more properly go to weight rather than admissibility.  *Id.*

Though the higher range of Gursha's comparative valuation evidence exceeds the charges owed at the time the dispute began, the evidence supports, and the parties agree, that "the value at a public auction 'always is a discounted price and unpredictable.'" (Reply at 4.)  Xport argues particular features of the gloves support the expectation of a higher valuation—that they are "approved by the FDA for medical use."  (*Id.* at 5.)  The record reflects a wide variety of glove brands.  (Bruendel Decl. Ex. 3 at 18.)  But there is no evidence in the record establishing FDA approval, other than the declaration of Mario Bruendel, Xport's Chief Executive Officer, (Dkt. 21-1 [Supplemental Declaration of Mario Bruendel, hereinafter "Supp. Bruendel Decl."] ¶¶ 1, 3), which is contradicted by Gursha, who personally reviewed the gloves at issue, (Gursha Decl. ¶¶ 3, 5.).  Xport had a list of the brands at issue before filings its reply, (Supp. Bruendel Decl. Ex. 3 at 18), and could have offered conclusive proof of FDA approval for those brands to rebut the Gursha Declaration.  But it did not do so.

With the variability in glove value and the unpredictable nature of a public auction in mind, the Court finds there is "a reasonable relationship between the goods withheld and the charges owed."  *See Fabrique Innovations, Inc*, 2020 WL 5441576, at *3.  Section 7210(f) supports this finding, as it expressly anticipates the proceeds of a sale exceeding the charges owed:  "A warehouse may satisfy its lien from the proceeds of any sale pursuant to this section but shall hold the balance, if any, for delivery on demand to any person to which the warehouse would have been bound to deliver the goods."

## 2.    Intentional Interference with Prospective Economic Relations & Contractual Relations[4]

"Under California law, an intentional interference with prospective economic relationship claim requires a party to show (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.  A plaintiff alleging interference with a prospective relationship is also required to allege an act that is wrongful independent of the interference itself." *Upper Deck Co. v. Panini Am., Inc.*, 469 F. Supp. 3d 963, 980 (S.D. Cal. 2020) (quotation marks and citations omitted).  The basis for this claim seems to be that Mesitis contacted some of Xport's current or potential customers with news about its planned sale.  (Compl. ¶ 32.)  Mesitis, however, did so to comply with Section 7210, which requires notification of "all persons known to claim an interest in the goods."  (Opp. at 6 [citing Pesek Decl. ¶ 6].)  Xport offers no evidence that the notified parties did not have an interest in the disputed goods.  (*See* Reply at 7.)  Xport therefore fails to show that it is likely to succeed on this claim because Mesitis cannot be liable for interference with prospective economic relations by doing what the California Commercial Code explicitly requires it to do.

"Under California law, the elements for the tort of intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to

---

[4] In its motion, Xport addresses the elements for intentional interference with contractual relations. (Mot. at 8.)  But Xport's complaint clearly alleges only intentional interference with prospective economic relations.  (Compl. at 6.)  Because both parties briefed the former, the Court analyzes both torts for the sake of completeness but questions the ability of Xport to succeed on the merits of a claim it did not plead.

induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014).

Xport did not provide any outstanding contract implicated by the goods at issue—it relies solely on Bruendel, who provides the conclusory assertion that "Xport has multiple contracts with customers for the sale of gloves of the type in Mesitis's possession. Xport has lost sales and breached or otherwise had disruption of these contracts with its customers due to its inability to timely, reliably and readily ship the goods stored in Mesitis's warehouse[.]" (Bruendel Decl. ¶ 10.) For the sake of this analysis, the Court accepts that unsupported assertion as true.

In a similarly unsupported manner, Bruendel asserts, "I have personally discussed my customer contracts with Mesitis, in particular with Patrick Pesek, sharing with him that the contracts are in place, that certain customers have placed orders pursuant to the contracts, and that I expect further orders from these customers. Multiple of these communications happened prior to Mesitis refusing to release Xport's goods." (*Id.* ¶ 11.) Pesek denies that Bruendel discussed customer contracts with him, and states he is not aware of Xport's contracts with customers. (Pesek Decl. ¶ 9.) Xport challenges Pesek's declaration by arguing that Pesek himself acknowledges "awareness of Xport's relationship with certain of its customers" as early as 2021. (*See* Reply at 7.) But "awareness of Xport's relationship with certain of its customers" is not the same as knowledge of a contract. And the letter used to establish Pesek's "awareness," (*see* Pesek Decl. Ex. 6), in no way proves or even hints at the existence of a current contract covering the goods presently stored by Mesitis. In any event, Mesitis's acts appear to have been intended to foreclose on its lien pursuant to Section 7210, not to induce a breach or disruption of any contractual relationship.

### 3.     Declaratory Relief

Section 7209(e) provides that "[a] warehouse loses its lien on any goods that it voluntarily delivers or unjustifiably refuses to deliver."  Again, Xport's failure to pay its storage costs entitles Mesitis to hold all Xport's goods and foreclose on its lien in a commercially reasonably manner in conformity with the California Commercial Code. Xport has not shown that Mesitis has unjustifiably refused to deliver its goods and has therefore not shown a likelihood to succeed on its claim for a judicial determination that Mesitis has lost its lien.

## B.     Likelihood of Irreparable Harm

Injunctive relief requires that a plaintiff offer evidence which establishes that irreparable harm is likely absent an injunction.  *Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250–51 (9th Cir. 2013).  "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Speculative harm does not establish irreparable harm sufficient to warrant a preliminary injunction.  *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) ("[T]he court determined that Goldie's would lose goodwill and 'untold' customers.  This finding, not based on any factual allegations, appears to be speculative. Speculative injury does not constitute irreparable injury."); *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist., Anchorage, Alaska*, 868 F.2d 1085, 1088 (9th Cir. 1989) (holding a loss of contract was not a sufficient injury where there was no evidence that contract would have been profitable); *Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir. 2017) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.").

Xport's showing of irreparable harm is not persuasive.  It asserts that without injunctive relief it "will suffer irreparable harm in the form of lost future sales, damage to its reputation, loss of goodwill, and other unquantifiable harms to Xport as a longtime seller of these goods." (Mot. at 9.)  Much of this alleged harm could be adequately addressed by a monetary award.  Lost profits from unfulfilled contracts could be calculated.  The magnitude of the claimed harm is also speculative.  Xport has not provided any of the contracts it claims it will breach or lose.[5]  As Mesitis correctly points out, the aftermath of the COVID-19 pandemic undoubtedly impacted the market for the goods at issue.  (Opp. at 8; Gursha Decl. ¶¶ 3–4.)

The Court does not dismiss Xport's claim of suffering irreparable harm in its entirety.  The Ninth Circuit recognizes that loss of reputation and goodwill *can* constitute irreparable harm.  *Herb Reed Enterprises, LLC*, 736 F.3d at 1250; *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).  Bruendel claims that Xport's reputation has already, and will continue to be, irreparably damaged, Xport has breached contracts with customers, and will presumably breach pending contracts, impacting future sales prospects.  (Bruendel Decl. ¶¶ 8, 10, 12.)  He asserts "[t]hese losses and damages will continue to compound, unless and until Xport is returned its goods, and even then, Xport will have already suffered irreparable injury." (*Id.* ¶ 10.)  Xport also offers an excerpt of an email between Bruendel and one of Xport's customers, which threatens litigation and demonstrates Xport's deteriorating relationships with at least one customer as a result of its inability to access its goods.  (Supp. Bruendel Decl. Ex. 6.)

---

[5] Xport does provide 19 invoices to customers, the most expensive of which involved a sale for $1490. (*See* Bruendel Decl Ex. 1; Supp. Bruendel Decl. Ex 5.)  Xport has provided no indication that these invoices are pending or otherwise impacted by this dispute.  The Court does not find the profitability ostensibly demonstrated by the invoices particularly compelling in light of the relatively high number of goods at issue when compared to the low number of goods accounted for in the provided invoices.

Despite Xport's evidence of its alleged loss of reputation and goodwill, the Court does not believe Xport has shown that the irreparable harm factor weighs in its favor. The goods at issue are not unique—they are fungible and relatively low cost.  Nor has Xport explained why the alleged loss of reputation and its goodwill cannot be adequately addressed by a monetary award.  *See Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) ("The long history of operation by both Appellants ensures that they will be able to calculate money damages for any loss of goodwill they may have suffered[.]").  And most significantly, Xport's alleged loss of reputation and goodwill was the result of Xport's own failure to pay its bills on time, giving Mesitis really no choice but to foreclose on its lien in compliance with the California Commercial Code to recoup as much as possible the money it is owed for storing Xport's goods.  To the extent that Xport has suffered a loss of reputation and goodwill, it has been self-inflicted.

## C.   Balance of Equities

"Before issuing a preliminary injunction, 'courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 24).  Xport argues that the balance of equities tips in its favor because it offered to pay what it believes are the amounts due and payable for the storage of its goods "so long as goods were released by Mesitis."  (Mot. at 10.)  But that argument only has merit if Mesitis could recoup its storage fees from the goods Xport offered to let Mesitis retain.  As discussed above, Xport has not proved that the amount of goods it offered to let Mesitis retain would cover the disputed charges.

It is also significant that, despite the requirement of Federal Rule of Civil Procedure 65(c), Xport is unwilling or unable to provide funds as a security.  (*See* Mot. at 11.)  Instead, Xport again offers to allow Mesitis to retain goods based on Xports's

calculations.  Alternatively, Xport has offered a delayed bond—but offered no assurance that it will be able to deliver on that offer.  (*See id.* at 12.)

Were the Court to grant the preliminary injunction, Xport will still not have paid its outstanding bill, and Mesitis would lose its ability to exercise a warehouse lien consistent with the California Commercial Code.  The evidence shows that Xport undeniably fell behind on storage payments.  (Pesek Decl. Ex. 3 [conceding "$265,463.17 is due and owing"]; *id.* Ex. 7 at 5 ["While it is unlikely that we will be able to clear the entire balance by the end of the month, we assure you that we are committed to paying off at least $200,000 within that timeframe."]; *id.* at 2–3 [claiming "$175,000 . . . would cover the cost of all invoices outstanding for more than 90 days].)  While the precise amount owed at this time is disputed, it is not disputed that Xport has long known that it owes Mesitis payment for the storage of its goods and has not paid what it concedes it owes.  In the meantime, Mesitis has had to bear the costs of the storage for Xport's goods itself. Indeed, the evidence before the Court indicates that Xport knew that Mesitis was unable to pay *its* landlord because of Xport's failure to pay for the storage of Xport's goods. (Pesek Decl. Ex. 7 at 4.)  The balance of equities actually tips in Mesitis's favor, not in Xport's favor.

### D.    Public Interest

As Xport recognizes, this is a private dispute between two companies.  (Mot. at 11.)  "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009) (cleaned up).  "In deciding whether to issue an injunction in which public interest is affected, a district court must

expressly consider the public interest *on the record*."  *N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988) (emphasis added).

The parties have not presented evidence of significant public interest cutting in favor of either granting or denying Xport's motion for a preliminary injunction.  Citing *Gerber*, Xport asserts "the public has an interest in the continued flow of commerce, which does not include locking warehouse doors and auctioning off property clearly belonging to another entity."  (Mot. at 11 [quoting *Gerber Plumbing Fixtures, LLC v. Amerifreight, Inc.*, 2015 WL 3824149, at *4 (C.D. Cal. June 18, 2015)].)  But *Gerber* did not involve an asserted warehouseman's lien—it involved civil immunity pursuant to California Civil Code Section 1993, the application of which the court found "nonsensical."  *See* 2015 WL 3824149, at *3.  In the present case, a warehouseman's lien is applicable.  To the extent the public has an interest in the continued flow of commerce, the public has an equal interest in warehouses and storage facilities having an effective and expedient remedy when customers default on their obligations to them.

## V.    CONCLUSION

The Court **DENIES** Xport's motion for a preliminary injunction.[6]

DATED:      September 25, 2023

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[6] Notwithstanding the Court's denial of Xport's motion, the Court strongly encourages the parties to meet and confer to determine whether they can reach a mutually acceptable process for selling the goods, which is what both parties desire, to avoid further needless and costly litigation.